FILED

2020 Apr-23  PM 01:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GINA LABOVITZ,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:18-cv-01918-RDP** |
| | } | |
| **SPRINGVILLE PEDIATRICS, LLC, et al.,** | } | |
| | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

The Pregnancy Discrimination Act prohibits discrimination against pregnant women.[1] 42 U.S.C. § 2000e; *see Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 212 (2015) (citing 42 U.S.C. § 2000e–2(a)(1)). An "employer" under Title VII is "engaged in an industry affecting commerce [with] fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person." 42 U.S.C. § 2000e(b). In this lawsuit, Plaintiff Gina Labovitz claims that Defendants Springville Pediatrics, LLC and Peter Strogov[2] discriminated against her because of her sex in violation of Title VII.

With this backdrop, there are two questions before the court: (1) Whether Defendants fit the definition of "employer" under Title VII; and (2) if so, whether there is substantial evidence that Defendants discriminated against Plaintiff because of her sex—specifically, her pregnancy.

---

[1] In 1978, Congress broadened the protections stemming from the term "sex" to extend to "women affected by pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

[2] Notwithstanding the fact that Title VII does not impose liability upon individuals, Plaintiff named Strogov as a defendant -- in his capacity as the common, controlling manager of multiple entities (*i.e.*, invoking "parent-subsidiary authority") -- under the "single employer" test. The court will address, in depth, whether this is proper.

This case is before the court on Defendants' Motion for Summary Judgment. (Doc. # 26). The Motion has been fully briefed (*see* Docs. # 26, 31, 34) and is ripe for review. After careful review, and for the reasons explained below, Defendants' Motion (Doc. # 26) is due to be denied.

## I.      Factual Background[3]

Plaintiff Gina Labovitz is a Board-Certified Pediatrician. (Doc. # 29-6 at 17).[4] She graduated from University of Kentucky College of Medicine in May 2013. (*Id.*). After graduation, Plaintiff completed a three-year pediatric residency program at the University of Alabama Birmingham ("UAB"), where she rotated between UAB and Children's Hospital. (*Id.*; Doc. # 27-5 at 20). After her residency, in July 2016, Plaintiff began working as a pediatrician at Southlake Pediatrics.[5] (Docs. # 29-6 at 17; 27-5 at 21, 23-24). However, Plaintiff remained open to exploring other employment opportunities. (Doc. # 27-5 at 53-54). In fact, she employed the services of MedPlan—a recruiting firm that placed her with a recruiter, Nan Mullinax. (*Id.* at 55, 57). After numerous conversations with Plaintiff about potential employment opportunities, Mullinax introduced Plaintiff to Dr. Peter Strogov. (*Id.*).

### A.      Dr. Peter Strogov and His Pediatric Clinics

Defendant Peter Strogov is a Board-Certified Pediatrician. (Doc. # 27-1 at 11-12). Strogov graduated from Rutgers Medical School in 2007 and completed his residency at the same program in 2010. (*Id.* at 12). He then moved to Fort Payne, Alabama to work at Isbell Medical Group, a

---

[3] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[4] When the court cites to a specific page number, with respect to depositions, the page number corresponds to the deposition page number. With respect to any other document, however, the court cites to the court-filed page number.

[5] While at Southlake, Plaintiff's annual salary was approximately $135,000. (Doc. # 27-5 at 30).

private practice firm. (*Id.* at 12-13). In 2012, Strogov left Isbell Medical Group and started his first solo practice—Fort Payne Pediatrics. (*Id.* at 15-16).

Today, Strogov holds an ownership interest in four pediatric offices in Alabama[6]: (1) Fort Payne Pediatrics, LLC; (2) Smart Start Pediatrics, LLC; (3) Kids 1st Pediatrics, LLC; and (4) Springville Pediatrics, LLC. (Doc. # 27-1 at 16-28). Fort Payne Pediatrics has been referred to as the "model" for each of these offices. (Doc. # 27-1 at 85).

### 1.    Fort Payne Pediatrics

Fort Payne Pediatrics ("FP") is located in Fort Payne, Alabama. It currently has approximately 35 employees. (Doc. # 27-1 at 17). Strogov is the 100 percent owner of FP. (*Id.* at 93). In 2017 (which is the relevant time period), FP's management consisted of Strogov, Morgan Pinholster,[7] and Jessica Cushen.[8] (*Id.* at 17). Strogov, Pinholster, and Cushen were the relevant decisionmakers regarding day-to-day management decisions, while Strogov, as the sole member, was responsible for the big picture decisions, including hiring physicians. (*Id.* at 19). Additionally, Charles Rose[9] was recruited as a consultant for FP in 2012, but he was not involved in management. (*Id.* at 17-18; Doc. # 27-4 at 9). Rose first started out by assisting with bookkeeping,

---

[6] Strogov is considering opening a pediatric clinic in Athens, Alabama; however, it is not open for business yet. (Doc. # 27-4 at 13). Strogov also has ownership interest in other entities, including: (1) TBPS Holdings, LLC; (2) Insight Eye Care LLC; (3) FPP Holdings, L.C.C.; (4) Frontier Management Group LLC; (5) Kids 1st Holdings, LLC; (6) PSJG, LLC; and (7) Healthy Futures Holdings, LLC. (Doc. # 27-1 at 92).

[7] Pinholster began employment at FP in 2012. (Doc. # 27-3 at 9). She initially started out as a medical assistant, but she soon after transitioned to the Human Resources Manager and handles "anything related to personnel," including negotiating terms in contracts. (*Id.* at 10, 12, 40). In 2016, Pinholster worked at Kids 1st as a consultant but was never an "employee" of Kids 1st. (*Id.* at 13). In 2017, she also worked as a consultant at Springville. She was more involved with Springville, but she has not been involved in hiring and firing employees, other than offering her opinion. (*Id.* at 26-27).

[8] Cushen was the previous office manager at FP. In 2017, she was recruited by SP to help register it as a rural health clinic. (Doc. # 27-3 at 21-22). She was paid a flat fee in early 2018 for this work. (*Id.* at 22).

[9] Rose was paid a fee of $900/month for his consulting work with FP in 2017. (*Id.* at 25). Rose currently handles the bookkeeping and accounting for FP, K1st, and Springville. (Doc. # 27-1 at 95).

3

broadening his responsibilities over time to include financial analysis, including tax analysis, and eventually making recommendations for bonuses, raises, and salary offers. (Docs. # 27-1 at 17-18; 27-4 at 10).

### 2.      Smart Start Pediatrics

Smart Start Pediatrics ("SS") is located in Albertville, Alabama. (Doc. # 27-1 at 20). It has approximately 10 employees. (*Id.* at 20). Strogov is the 50 percent owner of SS, and Tracy Bell (a pediatric nurse practitioner) owns the remaining 50 percent. (*Id.* at 23, 93). Strogov and Bell purchased SS from Dr. Pua in 2014. (*Id.* at 20). In 2017, Teresa Ashley (the office manager at that time) and Bell were responsible for the day-to-day operations, while Strogov and Bell were responsible for the big picture decisions, including hiring physicians. (*Id.* at 21-23). Darla DeShea Dalton currently serves as the office manager at SS. (*Id.* at 22).

At one point (likely around 2017), Rose provided bookkeeping consulting services for SS. (*Id.* at 24). However, Rose no longer provides those services because Bell recruited a local accounting and bookkeeping firm, MDA Professionals, P.C., to assist SS with its finances. (*Id.* at 23-24, 95).

### 3.      Kids 1st Pediatrics

Kids 1st Pediatrics ("K1st") is located in Scottsboro, Alabama. (Doc. # 27-1 at 24). It has around 10 to 14 employees. (*Id.*). Strogov is the 100 percent owner of K1st. (*Id.* at 93). In 2017, Beth Weldon (the office manager) was responsible for the day-to-day operations, while Strogov was responsible for the big picture decisions, including hiring physicians.[10] (*Id.* at 25). In 2017, Rose provided similar financial consulting services for K1st. (*Id.* at 25).

---

[10] Pinholster testified that she has helped with some hiring decisions at K1st. (Doc. # 27-3 at 45-46). For instance, when Dr. Dennis Basila was hired as a physician at K1st, she was present with Strogov during the interview. (*Id.* at 46).

4

### 4.      Springville Pediatrics

Defendant Springville Pediatrics ("SP") is located in Springville, Alabama. It has approximately nine employees. (Doc. # 27-22 at 1). From 2017-2018, it employed a maximum number of eight workers. (*Id.*). Strogov is the 50 percent owner of SP, and Monica Chadwick Squires[11] (a pediatric nurse practitioner) owns the remaining 50 percent. (Doc. # 27-1 at 93). Squires and Jennifer Richardson (the office manager) were responsible for the day-to-day management of SP, while Strogov and Squires were responsible for the big picture decisions, including hiring physicians. (*Id.* at 27). Rose[12] provided similar financial consulting services to SP during its startup phase (in 2017-2018). (*Id.* at 28). Pinholster[13] also provided consulting services for SP during its startup phase, including organizing and streamlining the timeline for construction and operations. (Doc. # 27-3 at 16-17). For example, Pinholster would contact pharmacies, contract with medical supply companies, review medical supplies, set up the electronic medical records system, and set up an account with a payroll company. (*Id.* at 18). Rose and Pinholster were also consulted by Strogov and Squires "for the bigger hires." (Doc. # 27-1 at 28). SP opened for business in March 2018. (Doc. # 27-7 at 41; *see* Doc. # 27-1 at 126 (noting that SP opened on April 1, 2018)).

### B.      Similarities Between Each Practice[14]

Multiple individuals associated with Strogov and his clinics have testified that each pediatric clinic is a separate and independent entity. (Docs. # 27-1 at 127; 27-4 at 21; 27-7 at 97).

---

[11] Squires initially met Strogov in February or March 2017 at his house in Fort Payne, Alabama. (Doc. # 27-7 at 15-16). After Squires and Strogov decided to open SP together, she began working as a nurse practitioner at FP. (*Id.* at 24). Squires worked at FP until February 2018, just before SP opened. (*Id.* at 25).

[12] Rose was paid a monthly fee of $600/month from SP for his consulting work in 2017. (Doc. # 27-4 at 22).

[13] Pinholster was paid a $20,000 flat fee by SP for her consulting work. (Doc. # 27-3 at 16).

[14] In opposing Defendants' Motion, Plaintiff focuses primarily on the relationship between SP and FP.

Specifically, Strogov testified that "[he] take[s] each individual clinic as its own entity." (Doc. #

27-1 at 133). The following list highlights the primary differences between the clinics:

- Each clinic possesses its own Quickbooks system for bookkeeping purposes (*see* Doc. # 27-4 at 13);

- Each clinic has its own agreement with MTS Generation,[15] a medical billing company. (Doc. # 27-4 at 15). Each practice is priced individually based on its volume (*see id.* at 16);

- Although each clinic was designed by the same architect, each clinic has its own architectural and engineering plan (*see* Doc. # 27-1 at 129);

- There are no shared business models between the clinics (*see* Doc. # 27-1 at 130);

- Each clinic has its own, individualized employee handbook made by the managing entities of each clinic (*see* Doc. # 27-1 at 131);[16]

- Each clinic has a different pay structure based on the specific geographic area of the clinic (*see* Doc. # 27-1 at 131-32);

- "There is no shared equipment, vehicle(s), software license[s], real estate[,] or other real, personal[,] or intangible property" between the clinics (*see* Doc. # 27-1 at 96);

- Each clinic has its own separate training methods based on the specific geographic area of the clinic (*see* Doc. # 27-1 at 131-32); and

- No clinic utilizes the same employment agreements, although there is some dispute about whether there is a "form" employment contract (*see* Doc. # 27-4 at 33).[17]

On the other hand, there are similarities between each of the clinics:

- Strogov is at least a 50 percent owner of each clinic (*see* Doc. # 27-1 at 92);

- FP, K1st, and SP are all on the same insurance policy. (Doc. # 27-4 at 14). Strogov "group purchased" an insurance policy to save money. (*Id.*). However, this policy allocates individual amounts to each practice, and the policy is "paid for by check from one practice

---

[15] MTS Generation's managing member is Michelle Strogov. (Doc. # 29-19 at 1).

[16] Strogov contradicted this statement during a surreptitiously recorded phone call with Plaintiff on December 19, 2017. (Def. Ex. N, Audio Recording from December 19, 2017, at 9:19-9:22). Strogov stated that the policy and procedural manual (*i.e.*, the employee handbook) is "the same for all employees across all practices." (*Id.*).

[17] There are slight inconsistencies in the record as to whether there is a "form" employment contract. Strogov testified that a base form of the agreement came from Isbell Medical Group. (Doc. # 27-1 at 72). Further drafts were provided by the following persons: Nikki Scott, an attorney; Will Parks, an attorney; Pinholster; and Rose. (*Id.* at 71).

and then invoiced from that one practice to the other practices to reimburse for their applicable portion." (*Id.*). The initial payor of the insurance policy depends on what the purchase is, but it could be FP "making that initial payment and then invoicing out" (*see id.* at 14-15);

- Strogov also group purchases "merchant services," such as credit cards, for FP, K1st, and SP, but each entity has its own contract (*see* Doc. # 27-4 at 15, 23);

- Although each clinic has its own medical billing system, Strogov receives a volume-based discount from MTS Generation (*see* Doc. # 27-4 at 15);

- Some of FP's employees, such as Pinholster and Cushen, perform services for other clinics, such as SP (*see* Doc. # 27-3 at 16-17);

- SP's website has a page titled "Our Locations" that shows a picture of the buildings for FP, SS, and K1st (*see* Doc. # 29-11 at 2); and

- Strogov attaches the logo for each pediatric clinic to the signature area in his email messages (*see* Doc. # 27-6 at 41).

Finally, in an unsworn statement, Squires stated that SP "banks at First State Bank and Avadian Bank" and does not share any bank accounts with any other entity.[18] (Doc. # 27-22 at 1). Notably, while each entity may have separate bank accounts, in 2018, SP received numerous loans from these other entities to help begin operations: (1) on March 1, 2018 and November 27, 2018, FP loaned SP $200,000 and $100,000, respectively; (2) on March 22, 2018 and July 12, 2018, Springville Holdings loaned SP $119,154.32 and $100,000, respectively; (3) on July 12, 2018, Kids 1st Holdings loaned SP $50,000; (4) on July 12, 2018, K1st loaned SP $100,000; and (6) on July 12, 2018, MTS Generation loaned SP $100,000. (Doc. # 29-14 at 2, 4). The court has reviewed the record but has not observed evidence that interest was charged or paid on any of these "loans."

### C.    Plaintiff's Employment Offer from Strogov and Springville Pediatrics

Nan Mullinax first connected Plaintiff with Strogov on September 8, 2017. (Docs. # 27-5

---

[18] Squires also stated that SP's telephone number is not "shared" with any other entity, nor does SP share a telephone switchboard or answering service with any other entity. (Doc. # 27-22 at 1).

at 82; 27-6 at 43). Strogov had called Plaintiff to discuss an employment opportunity at what he hoped would be a new pediatric clinic in Athens, Alabama, and later followed up that phone call with an email.[19] (Docs. # 27-5 at 82; 27-6 at 40). Plaintiff responded to Strogov on September 12, 2017, stating that she "really enjoyed hearing about the opportunity in Athens" and hoped to visit the site soon. (Doc. # 27-6 at 40).

On September 14, 2017, Beth Weldon, the office Manager for K1st, emailed Plaintiff to schedule a site visit and a tour of FP and K1st on September 17, 2017. (Doc. # 27-6 at 81). On September 19th, after the site visit, Plaintiff emailed Strogov to inform him that she was "seriously considering" the opportunity in Athens. (Doc. # 27-6 at 84-85). However, on October 19, 2017, due to unforeseen circumstances, Strogov could not offer Plaintiff the Athens physician position. Instead, he discussed with Plaintiff a different employment opportunity available at his new location, SP, which was scheduled to open on March 1, 2018.[20] (Doc. # 27-6 at 89).

Plaintiff responded to Strogov's email on October 19th, stating that she was "definitely" interested in the position at SP because of its easy commute from Birmingham. (Doc. # 27-6 at 89). Plaintiff inquired about the rural classification of SP, because often rural-designated clinics generally have favorable loan repayment plans for physicians. (*Id.*). Strogov responded that same day with more information about SP. (*Id.* at 88). Although Strogov told Plaintiff he "would love it if [she] was one of the candidates [he] could choose from" for the Athens position because her "experience, personality, and demeanor are all great," he continued to discuss the possibility of her applying to work at SP. (*Id.*). Strogov told Plaintiff that SP was currently being built, and he

---

[19] On September 8, 2017, Strogov told Mullinax that he wanted to "land this candidate," referring to Plaintiff. (Doc. # 29-20 at 2). In fact, he was willing to present her with an offer of $220,000/year with a $20,000 signing bonus. (*Id.*).

[20] The physician who was supposed to fill the physician position at SP, Dr. Dennis Concoby, was unable to obtain his licensure for the State of Alabama, so he was ineligible for hire. (Doc. # 27-7 at 31-33).

was "currently talking with a hospital to see if they would be willing to help [them] out with sign-on bonus[es], relocation fund, and loan repayment for [SP]," because (at that time) they did not have those benefits to offer. (*Id.*). He also told Plaintiff that "[t]he salary and benefits are similar to the one we provided . . . for Athens," and that any possibility for loan repayment would be available no sooner than two years from the start of operation. (*Id.*). Plaintiff replied that same day and continued to express interest in the potential employment opportunity at SP. (*Id.* at 88).

On October 22, 2017, Plaintiff met Strogov and Squires at the future site of the SP clinic. (Doc. # 27-6 at 92). On October 25, 2017, Squires emailed Plaintiff to thank her for visiting SP and to tell her that they "think [she is] a great candidate for [SP]." (*Id.* at 91). On October 28, Plaintiff responded and told Squires that she "really feel[s] like [their] vision aligns well with [hers] and [she] see[s] this as a great long term career opportunity." (*Id.*).

On November 15, 2017, Mullinax emailed Plaintiff to inform her that Strogov wanted to extend an offer for her to work at SP. (Docs. # 27-5 at 107-08; 27-6 at 64). On November 17, 2017, Pinholster formally extended an employment offer to Plaintiff.[21] (Doc. # 27-6 at 108-09). Strogov testified that they wanted to hire Plaintiff due to "geography and [their] expectation that she would provide some longevity and not leave." (Doc. # 27-1 at 51). On November 20, 2017, Plaintiff responded to Pinholster, acknowledging receipt of the contract and informing Pinholster that she would review it. (Doc. # 27-6 at 107). Plaintiff asked Larry Geller, a consultant, to review the contract. (Doc. # 27-5 at 31, 116). Due to the intervening Thanksgiving holiday and his concern about what he viewed as "unconventional" provisions in the contract, Geller took approximately

---

[21] Around the time Plaintiff received the offer from Strogov at SP, on November 22, 2017, Plaintiff received an offer from Urgent Care for Children ("UCC"). (Doc. # 27-5 at 118). The base salary was $200,000, the office was located in Birmingham, and there was a productivity incentive pay. (*Id.*). However, Plaintiff maintained that she preferred SP because it was a better opportunity. (*Id.*). Nevertheless, on December 5, 2017, Plaintiff sent a counterproposal to UCC. (*Id.* at 121). But ultimately, Plaintiff turned down UCC's offer in order to pursue employment at SP. (*Id.* at 166).

23 days to complete his review. (*Id.* at 117).

On November 28, 2017, Mullinax sent Plaintiff a text message asking for an update as to the status of the employment contract. (Doc. # 27-6 at 65). Plaintiff informed Mullinax that her contract was being reviewed. (*Id.* at 66). On December 4, 2017, Plaintiff sent Mullinax a text message updating her about the timeframe for when she should have the contract back. (*Id.* at 67). Also, on December 4, 2017, Strogov emailed Mullinax informing her that they received an "ultimatum" from their other candidate who told them he needed an answer by the end of the week, or he was walking.[22] (Doc. # 29-20 at 34). On December 7, 2017, Mullinax again sent Plaintiff a text message requesting an update, and Plaintiff responded by telling Mullinax that there were some issues with the contract, but that she was "hopeful that if [they could] get them resolved [she would] be ready to sign it." (*Id.* at 69). On that same day, Plaintiff also emailed Strogov to update him as to the status of the contract. (*Id.* at 105). Strogov responded and told Plaintiff that he "had high hopes that [she] would be joining the team at [SP]." (Doc. # 27-1 at 53).

On December 12, 2017, Mullinax sent Plaintiff a text message requesting an update, and Plaintiff told her that she was waiting to hear from Geller. (Doc. # 27-6 at 72). Finally, on December 13, 2017, Plaintiff informed Mullinax that she received the contract back and sent her counterproposal to Strogov and Squires. (*Id.* at 72-73, 105; Doc. # 27-5 at 149-50). Plaintiff's counterproposal included, among other things, an adjustment to her base salary (*i.e.*, she requested $240,000 as opposed to $200,000), a $20,000 signing bonus, a change to the noncompete provision,[23] and potential partnership track eligibility. (Doc. # 27-7 at 81-82).

---

[22] This is disputed. The other candidate, Dr. David Griffin, who is discussed below, testified that he never gave Strogov or Squires such an ultimatum. (Doc. # 27-2 at 26).

[23] The proposed change to the noncompete clause sought to (1) reduce the mileage that would be excluded around each of the clinics (from 30 to 15 miles), (2) clarify that the clause only applied to the geographic area surrounding the SP clinic, and (3) provide that the clause would only be enforceable for twelve months, as opposed to three years. (Doc. # 27-14 at 2).

After Strogov and Squires received Plaintiff's counterproposal, on December 14, 2017, they both communicated with Rose about Plaintiff's proposed changes. (Doc. # 27-7 at 80). Strogov and Squires were concerned with many of Plaintiff's proposed changes, including the requested base salary, the noncompete clause, and the partnership proposal.[24] (Docs. # 27-1 at 57-59; 27-2 at 77-78). Squires thought that Plaintiff's proposed changes were unreasonable. (Doc. # 27-7 at 77-78). Nonetheless, Rose advised them on numerous aspects of the proposed changes, including the following: (1) they needed to set a hard deadline for Plaintiff to either accept or reject their proposed offer after incorporating the negotiated changes (particularly because it took her almost four weeks to send back a counterproposal); (2) he thought it would be "OK" to give up on the noncompete and "up[] the base salary by 10K;" and (3) if Plaintiff was only scheduled to work at SP, but SP does not open until a date later than April 1, 2018, then she should be required to work at "a related clinic," such as FP, and see patients until SP was operational. (*Id.*).

On December 14, 2017 at 12:26 a.m., Strogov emailed Plaintiff with his comments as to Plaintiff's suggested changes to the employee contract. (Doc. # 29-16 at 1). Strogov indicated that this new proposal was "a final offer," because there was another candidate who was "willing to sign the contract 'as-is.'" (*Id.*). However, Strogov reiterated to Plaintiff that she was their "first choice." (*Id.*). On December 14th at 7:24 a.m., Strogov texted Mullinax that he had offered the other candidate a contract to work at SP, but that he still wanted Plaintiff. (Doc. # 27-6 at 167). On December 14th at 5:33 p.m., Plaintiff accepted the "final" offer and employment contract. (*Id.*). Plaintiff stated, "[a]ssuming the final contract reflects these changes, I will be ready to sign it and finalize everything. . . . I look forward to being a part of the [SP] team." (*Id.*). On December 15th,

---

[24] In fact, when Strogov reviewed Plaintiff's proposed changes, he sent Mullinax a text message stating, "[w]hoa…those are some crazy demands. I'll respond but I don't think we are going to be able to find common ground." (Doc. # 27-6 at 166).

Squires emailed Plaintiff, stating:

> We are excited that you have accepted our offer. Now that we have reached an
> agreement regarding the terms of the contract, we will send the suggested changes
> we have discussed to our attorney for official approval. As soon as we receive
> feedback from the attorney,[25] we will immediately notify you.

(*Id.*). Although Plaintiff accepted the offer and believed she had an agreement with Strogov and

Squires, she never received a finalized contract reflecting the discussed changes. (Doc. # 27-5 at

152-53). Strogov, however, says that Squires' email did not represent a finalized, contractual

relationship because his attorney -- who reviewed the agreed-to changes -- wanted Strogov to

negotiate more with the language of the noncompete clause. (Docs. # 27-1 at 69; 27-6 at 168).

On the evening of December 19, 2017, Strogov met with Squires, Pinholster, Rose, and

Cushen to discuss the candidates for the SP position. (Doc. # 27-1 at 77-81, 90). At 5:36 p.m. on

December 19th, unbeknownst to Plaintiff, Strogov and Squires claim they decided to hire the other

candidate. (Doc. # 27-2 at 28-29). On December 19th around 6:01 p.m., Plaintiff called Strogov to

inform him that she was pregnant and was due in May 2018.[26] (Docs. # 27-1 at 77-82, 91; 27-5 at

190). During this phone call, Strogov made statements evidencing his intention to hire Plaintiff.

For example, when Plaintiff asked about marketing, Strogov stated that "prior to [her] starting or

even after [she] started" at SP, she would work throughout the community to market the clinic.

(Def. Ex. N, Audio Recording on December 19, 2017, at 3:22-3:25). Additionally, while

discussing when Plaintiff would give her 70-days' notice to Southlake Pediatrics, Strogov stated

that "70 days gives [them] a little bit of cushion" so that Plaintiff could start earlier at SP, if

---

[25] Lerin Ragan was the attorney retained by Strogov and Squires to review Plaintiff's proposed changes.
(Doc. # 27-1 at 73). However, Ragan only spoke with Squires over the phone about the contract; she did not visually
inspect the contract. (Doc. # 29-7 at 68, 85-86).

[26] On December 14, 2017, Geller had emailed Plaintiff with the proposed changes to send to Strogov and
Squires. (Doc. # 27-6 at 160). In that email, Geller advised Plaintiff to inform them of her pregnancy that day,
December 14. (*Id.*).

possible. (*Id.* at 6:25-6:37; 7:25-7:40). Finally, when discussing her potential start date and the opening of the clinic, Plaintiff stated that she was excited, and Strogov said, "good, as are we." (*Id.* at 2:45-2:50).

Strogov testified that he did not notify Plaintiff of their decision to hire the other candidate on December 19th, but instead waited until the next day, December 20th, because the "time and place weren't appropriate, [it] wasn't a professional setting, [he] had already talked with [Squires] about making that phone call the next day," and, in any event, they were waiting on the executed contract from the other candidate. (Docs. # 27-1 at 109; 27-7 at 105-06).

On December 20, 2017 at 12:33 p.m., Strogov sent a text message to Mullinax stating that the other candidate "accepted [the] terms [they] presented him and signed [the] contract, as is, with no changes." (Doc. # 27-6 at 169). Strogov stated, "[w]e are going with him. I will call [Plaintiff] this evening to inform her." (*Id.*). On the evening of December 20th, while Pinholster was present,[27] Strogov called Plaintiff to inform her that they were going with the other candidate for the physician position at SP. (Docs. # 27-1 at 108-09; 27-6 at 170). Plaintiff stated that during that phone call, Strogov told her that her negotiations "left a bad taste in his mouth." (Def. Ex. O, Audio Recording from December 20, 2017, at 18:50-19:10). Specifically, Strogov told Plaintiff she was "too aggressive[]" in her negotiations and that some of the elements in the "agreed to" contract were not in the best interest of his business. (Doc. # 1-1 at 4). After Strogov spoke with Plaintiff on December 20th, he sent a text message to Mullinax stating:

> Oh boy! I had a conversation with [Plaintiff] earlier to inform her that we would be hiring [another candidate]. I knew she would be upset but she took it to a very unprofessional level and attacked me personally. I really tried to make this a bit of a learning experience for her future opportunities[,] but I think it fell on deaf ears.

(Doc. # 27-6 at 170).

---

[27] Squires testified that she was not present for this phone call. (Doc. # 27-7 at 104).

### D.    Dr. David Griffin (Plaintiff's Comparator Evidence)

Dr. David Griffin is the "other candidate." (Doc. # 27-2 at 27). Griffin, who is originally from Tampa, Florida, earned his medical degree from American University of the Caribbean in St. Martin in 2014. (Doc. # 27-2 at 12, 15). In July 2017, he completed his residency at Memorial University Medical Center in Savannah, Georgia. (*Id.* at 9, 14). From July to October 2017, Griffin prepared for the pediatric Board exam. (*Id.* at 10). After completing his Board exam in October 2017, Griffin was "credentialed" through CompHealth.[28]

Although Griffin was licensed to practice medicine in Florida as of May 2017, he came to Alabama because his fiancé was an internal medicine resident at UAB.[29] (*Id.* at 13- 14). Griffin began his job search after completing his Board exam in October 2017. (*Id.* at 17). He decided to work with CompHealth and find locum tenens positions because he "thought locums [were] a good way to kind of get a feel for different outpatient positions, to get a feel for what kinds of things [he] liked about different positions."[30] (*Id.* at 18).

While scouting locum positions, in early November 2017, Becca Tercek -- Griffin's contact at CompHealth -- informed Griffin that Strogov was looking for a permanent physician at Scottsboro (K1st). (*Id.* at 18-19). Griffin initially contacted Strogov via email about the opportunity at Scottsboro and followed up with a phone call. (*Id.* at 20). However, because Scottsboro was "far away from Birmingham," Griffin told Strogov that he was not interested in a

---

[28] Being "credentialed" involves a company, in this instance CompHealth, gathering a physician's information on a CV so that it is easily accessible in one place. (Doc. # 27-2 at 10-11).

[29] Because her internal medicine residency is three years, Griffin knew that, as of June 2017, he and his fiancé would be in Birmingham for at least three years. (Doc. # 27-2 at 15).

[30] In December 2017, Griffin undertook a one-week locum assignment. (Doc. # 27-2 at 11). Then, in January 2018, Griffin was hired as an outpatient physician at Mobile Pediatrics, where he saw "general outpatient pathologies[,] Monday through Friday[,] for[] [approximately] two and a half months. (*Id.* at 12).

permanent position. (*Id.* at 18-20). During that same call, Strogov informed Griffin of the position at SP, but Griffin believed Strogov stated that the SP position was filled. (*Id.* at 19-20). Nevertheless, in November 2017, Griffin met with Strogov and Squires at the FP location to discuss the SP position.[31] (*Id.* at 20-22).

Griffin testified that, during his interview, one of Strogov's main concerns was whether Griffin and his fiancé were planning on staying in the Birmingham area after her residency ended. (*Id.* at 21). Griffin told Strogov that they were looking into it but could not commit because he was uncertain whether his fiancé was planning to pursue the internal medicine fellowship opportunity at UAB. (*Id.*).

Griffin does not recall speaking with Strogov again until December 14, 2017. (*Id.* at 23-24). On December 14, 2017, Strogov and Squires emailed Griffin to offer him the physician position at SP. (*Id.* at 26).

Squires explained that she preferred Griffin over Plaintiff due to (1) his reassurance that he wanted to stay in the area long term; (2) his willingness to take the contract with very little changes; (3) his personality (he seemed "extremely easy" to work with); (4) his reviews from previous employment positions; and (5) the fact that his Board exam scores were very good. (Doc. # 27-7 at 62). Squires also testified that SP's attorney, Lerin Ragan, advised that the position be offered to Griffin rather than Plaintiff. (*Id.* at 95).

Upon receiving the proposed contract, Griffin informed Strogov and Squires that he was in Miami, Florida with his father at the time and would need time to review the contract. (*Id.* at 26). Griffin's father (a labor lawyer) had just gotten out of the hospital and Griffin wanted him to review the contract before he signed it. (*Id.*). Griffin's father was able to review the contract on

---

[31] Griffin participated in this interview with Strogov and Squires even though he was not "Board-Certified" until late November or early December 2017. (Docs. # 27-2 at 13; 27-7 at 58).

December 16th or 17th, and on December 19, 2017 at 4:57 p.m., Griffin sent his counterproposal back to Strogov and Squires. (*Id.* at 26-27). Griffin proposed only minor changes, including an annual review clause and a slight adjustment to the noncompete clause.[32] (*Id.* at 27). Along with his counterproposal, Griffin inquired as to whether there was a "pathway to ownership" at SP; however, he testified that this was just a general question and was not a "demand or requirement" that he had for his acceptance of employment. (Doc. # 27-2 at 28-29).

On December 19th at 5:36 p.m., Strogov agreed to Griffin's proposed changes. He stated: "We are very excited that you are joining the team." (*Id.* at 27). It was at this point that Griffin believed he had entered into a contract with Strogov and Squires. (*Id.* at 44). On December 20, 2017, at 7:31 a.m., Pinholster sent the contract back to Griffin. (*Id.* at 26, 32). The contract was not finalized until December 27, 2017.[33] (*Id.* at 35).

On February 27, 2018, Plaintiff filed her Charge of Discrimination with the Equal Employment Opportunity Office ("EEOC"). (Doc. # 1-1 at 3). Plaintiff alleged sex discrimination and a violation of the Pregnancy Discrimination Act of 1978. (*Id.* at 4). On November 21, 2018, Plaintiff filed this lawsuit. (Doc. # 1).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking

---

[32] Griffin proposed that the noncompete clause only apply to existing facilities as of April 1, 2018, or that it otherwise exclude the Birmingham geographic area from the umbrella of the clause. (Doc. # 27-2 at 27).

[33] Notably, SP paid CompHealth's agency cost, which was approximately $24,000. Griffin testified that he offered to have that amount subtracted from his salary, but Strogov did not want to do that. (*Id.* at 41-42; Doc. # 29-22 at 21).

for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.   Analysis

Defendants argue that they are entitled to summary judgment because (1) SP and Strogov do not qualify as an "employer" under Title VII; and, (2) in any event, Plaintiff cannot establish a *prima facie* case of sex/pregnancy discrimination.

The court addresses each argument, in turn, and concludes that (1) whether SP qualifies as an "employer" under Title VII presents a genuine issue of material fact to be resolved by a jury; (2) Strogov is not a proper named defendant; and (3) Plaintiff has established a *prima facie* case of sex/pregnancy discrimination under the *McDonnell Douglas* framework.

### A.    Whether SP Qualifies as an "Employer" Under the "Single Employer" Test Is a Question for a Jury

Title VII defines an "employer" as an individual or firm that is "engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b). This definition is to be interpreted liberally. *See Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999) (en banc); *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987). "[T]he 'employee-numerosity requirement' is an element of a plaintiff's claim for relief, rather than a jurisdictional issue. *Fender v. Clinch Cty., Ga.*, 295 F. App'x 957, 958 (11th Cir. 2008) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515 (2006)); *Faulkner v. Woods Transp., Inc.*, 174 F. App'x 525 (11th Cir. 2006).

In order to determine whether an entity is an employer under Title VII, the court must ask this basic question: "who (or which entity) is in control of the fundamental aspects of the employment relationship that gave rise to the claim." *Peppers v. Cobb Cty., Ga.*, 835 F.3d 1289, 1297 (11th Cir. 2016) (quoting *Lyes*, 166 F.3d at 1345); *see Ewing v. Moore*, 2018 WL 3852297, *4 (N.D. Ala. Aug. 13, 2018). "An examination of this question requires consideration of the totality of the employment relationship." *Peppers*, 835 F.3d at 1297. Here, it is undisputed that, at all relevant times, SP employed less than fifteen employees. However, the question before the court is whether Plaintiff can aggregate employees from Strogov's other medical practices to satisfy the numerosity requirement as to SP.

Under Eleventh Circuit case law, there are three means by which a plaintiff may aggregate multiple entities for Title VII purposes: (1) the "single employer" or "integrated enterprise" test; (2) the "joint employer" test; and (3) the "agency" test. *Lyes*, 166 F.3d at 1341. First, under the "single employer" or "integrated enterprise" test, a plaintiff may aggregate two or more entities

where the entities are "highly integrated with respect to ownership and operations." *Id.* Next, under the "joint employer" test, a plaintiff may aggregate two or more entities where "two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees." *Id.* Finally, under the "agency" test, a plaintiff may aggregate two or more entities where "an employer delegates sufficient control of some traditional rights over employees to a third party." *Id.* Here, Plaintiff argues that the "single employer" or "integrated enterprise" test applies in this case to allow the employees of Strogov's clinics, particularly FP, to be aggregated with SP so that SP may qualify as an "employer" under Title VII.

"There are two circumstances where the [s]ingle [e]mployer [t]est is used: (1) to determine if a parent corporation should be integrated with a subsidiary corporation; and (2) to determine if a group of related companies should be integrated." *Gortney v. Joseph & Co.*, 2007 WL 9711464, *10 (N.D. Ala. July 6, 2007) (citing *McKenzie*, 834 F.2d at 931-34). In the latter situation (which is applicable here), "courts should be highly deferential to the corporate form and should only disregard it in extraordinary circumstances." *Keenan v. Matchmaker Int'l, Inc. of Mobile*, 1999 WL 33590522, *4 (S.D. Ala. Jan. 20, 1999) (citations omitted). This deference encompasses the notion that "[c]ommon ownership, absent some element of economic or other integration . . . will not be sufficient to warrant disregarding the corporate form." *Id.* (citing *Mochelle v. J. Walter, Inc.*, 823 F. Supp. 1302 (M.D. La. 1993)). Indeed, in order to aggregate employees from each of Strogov's clinics, Plaintiff "must come forward with some evidence indicating that the corporate entities were created in order to avoid the requirements of Title VII." *Id.* at *6.

Defendants argue that (1) Plaintiff cannot aggregate each clinics' employees for coverage under Title VII because Strogov's other clinics were not named as parties; (2) Plaintiff has failed

to show that SP and Strogov's other clinics constitute a "single employer"; and (3) Strogov is an individual and thus not subject to liability under Title VII.

### 1. Plaintiff Was Not Required to Name as Parties Strogov's Other Clinics to Aggregate Employees

Defendants assert that Plaintiff cannot satisfy Title VII's 15-employee threshold because she has failed to name as parties all potential clinics for aggregation of employees. But, this argument holds no water. Under certain circumstances, like those present here, a party is not required to name every entity as a party before aggregating employees for purposes of Title VII.

In *Landon v. Agatha Harden, Inc.*, 6 F. Supp. 2d 1333 (M.D. Ala. 1998), a plaintiff named as defendants only Agatha Harden, Inc. d/b/a/ Checkcare Systems and Jeff Harden and Agatha Harden, owners of Agatha Harden, Inc., even though Agatha Harden, Inc. owned other companies. *Id.* at 1342 n.4. The plaintiff sought to aggregate those other companies for purposes of meeting Title VII's 15-employee threshold. *Id.* The court concluded that summary judgment was inappropriate because there was a "material issue of fact as to whether the Agatha Harden, Inc. entities . . . are so interrelated with respect to operations, management, ownership and control, as to warrant aggregation of . . . employees." *Id.* at 1342. Notably, the court was quick to distinguish an earlier Eleventh Circuit case, *Rogero v. B.M. Noone*, 704 F.2d 518 (11th Cir. 1983), which held that aggregation (for purposes of Title VII) was inappropriate because "the appellant … failed to join [Putnum County] as a party . . . [thus it] deprived Putnam County of a chance to defend against potential liability." *Id.* at 521. Specifically, the court in *Landon* observed that the *Rogero* panel was primarily concerned that the County was not given notice. *Landon*, 6 F. Supp. 2d at 1342 n.4. However, the *Landon* court held that notice was not an issue because "[t]he unnamed Agatha Harden, Inc. entities . . . are all owned by named Defendants Agatha Harden and Jeff Harden, or the entity owned by Agatha Harden and Jeff Harden." *Id.* Additionally, the court held that "no

21

liability [would] attach to these smaller entities via an agency theory." *Id.*

Similarly here, the court concludes that notice to Strogov's other clinics is a nonissue because they are all owned, at least in part (if not outright), by Strogov, and, further, Plaintiff has not advanced an agency theory in this case; therefore, even if it could be said they lacked notice (which is debatable based upon the Rule 56 evidence), no liability will attach to Strogov's other clinics.

For these reasons, Plaintiff was not required to name as defendants Strogov's other clinics. *See Westphal v. Catch Ball Prods. Corp.*, 953 F. Supp. 475 (S.D.N.Y. 1997) (holding that the defendant company and two related companies -- each controlled by a common executive officer -- were properly aggregated and categorized as a "single employer" under Title VII). So, the next step is to proceed to this question—can plaintiff aggregate the employees at Strogov's other clinics?

## 2. The "Single Employer" Test

"The single employer theory 'involves examining various factors to determine if . . . nominally independent entities are so interrelated that they actually constitute a single integrated enterprise[.]'" *Long v. Aronov Realty Mgmt., Inc.*, 645 F. Supp. 2d 1008, 1029 (M.D. Ala. 2009) (internal quotations and citations omitted). "The single employer analysis ultimately 'concentrate[s] on the degree of control an entity has over the [allegedly liable conduct]' on which the suit is based." *Id.* at 1030 (quoting *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1244-45 (11th Cir. 1998)).

In the Eleventh Circuit, in order to determine whether two or more entities should be treated as a single employer, a court is to "apply the [factors] promulgated by the National Labor Relations Board." *McKenzie*, 834 F.2d at 933; *Radio & Television Broadcast Techs. Local Union 1264 v.*

*Broadcast Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965). These factors include: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.* "Not all factors need be present for the court to find that a single employer exists, nor is one factor alone controlling. However, the second factor 'is usually accorded greater weight than the others[,]' insofar as the relevant issue[s] in Title VII concern employment decisions." *Harriel v. Dialtone, Inc.*, 179 F. Supp. 2d 1309, 1311-12 (M.D. Ala. 2001) (quoting *Thornton v. Mercantile Stores Co.*, 13 F. Supp. 2d 1282, 1291 (M.D. Ala. 1998)).

The court now turns to a discussion of how the four factors apply to the facts presented here. After careful review of the Rule 56 evidence, the court concludes that there is a genuine issue of material fact regarding whether Strogov's clinics -- specifically SP and FP[34] -- qualify as a "single employer."

### i.  Interrelation of Operations

"Courts are to consider several indicia of interrelatedness: '(1) combined accounting records; (2) combined bank accounts; (3) combined lines of credits; (4) combined payroll preparation; (5) combined switchboards; (6) combined telephone numbers; and (7) combined offices.'" *Klein v. L–3 Commc'ns Corp.*, 2013 WL 5913776, *7 (M.D. Ala. 2013) (quoting *Walker v. Boys and Girls Club of Am.*, 38 F. Supp. 2d 1326, 1331 (M.D. Ala. 1999)).

Here, there is not a large volume Rule 56 evidence demonstrating interrelatedness. The Rule 56 record reflects that SP and FP do not share any combined accounting records, bank accounts, lines of credit (with the exception of the discount they receive for "group purchasing"), switchboards, telephone numbers, or offices.

---

[34] Plaintiff focuses solely on FP (Fort Payne) in her Response to Defendants' Motion for Summary Judgment. The court acknowledges that, at least based on the current Rule 56 record, FP is the only clinic that could plausibly be aggregated with SP under the "single employer" test.

Each clinic is incorporated separately and has a separate, individual office building. (Doc. # 27-1 at 96, 129). And, although SP and FP are on the same insurance policy, individual insurance payments are allocated to each clinic, and "the policy is paid for from one practice and then invoiced from that one practice to the other practices to reimburse for their applicable portion." (Doc. # 27-4 at 14).

On the other hand, Strogov's email signature contains a logo for each clinic, and SP's website has a page titled "Our Locations" showing pictures of FP, SS, K1st, and SP facilities. (*See* Docs. # 29-11 at 2; 27-6 at 41). Each clinic is connected via Strogov, and there is additional Rule 56 evidence suggesting that FP (or its employees, in addition to Strogov) had at least some input and control over the day-to-day management or hiring/firing decisions for SP. For example, Pinholster (an employee of FP) was involved in the startup of SP and formally extended the employment offer to Plaintiff. Testimony from Pinholster and Rose indicates that Pinholster and Cushen were eventually paid by SP in 2018 for their services performed in 2017,[35] and Rose was paid monthly fee of $600/month from SP for his consulting work done in 2017. (Docs. # 27-3 at 16, 22; 27-4 at 22). Nonetheless, Plaintiff argues that "uncompensated borrowing" (or compensation paid to Rose, Pinholster, and Cushen for SP work in 2017) is "highly indicative" of interrelatedness.

Of course, even if these individuals had been paid by FP for their services to SP, this does not necessarily rise to the level of "high integration" necessary to support a finding of interrelatedness. *See Cardinale v. Southern Homes of Polk, Cty., Inc.*, 2008 WL 788460, *9 (M.D.

---

[35] Specifically, Pinholster and Cushen were paid for their 2017 SP work in 2018, "somewhere around" the opening of SP. (Doc. # 27-3 at 22). The Rule 56 record indicates that SP opened on April 1, 2018. (Doc. # 27-1 at 126). So, this means that the payments to Pinholster and Cushen were made months after they performed their work for SP in 2017. And, it also means that the payments occurred after Plaintiff filed her Charge of Discrimination on February 27, 2018. (Doc. # 1-1 at 3).

Fla. Mar. 19, 2008) ("[R]ejecting single employer status where companies had no common offices, employees, or telephones, had separate accounting records, financial statements, and tax returns, *and where one company reimbursed the other for payroll and other services*." (citing *Fike*, 514 F. Supp. at 726-27) (emphasis added). But, it is still evidence to be considered.

Further, there is evidence that FP loaned significant amounts of money (a total of $300,000) to SP. But again, this alone is not enough to establish interrelatedness. *See Keenan*, 1999 WL 33590522, at *7 ("The corporate veil will not be pierced on the basis of a number of, even a substantial number of, intercompany loans which fund short-term cash flow needs.").

Finally, Plaintiff has presented evidence that Rose suggested to Strogov that, in the event SP was not operational by the time Plaintiff started her job there, she could work at FP to see patients. Rose also testified that FP was the "model" for all of Strogov's "sister clinics." (Doc. # 27-7 at 77-78).

Ultimately, the court concludes that Plaintiff has presented sufficient evidence to create a question of fact for a jury to resolve as to whether a requisite interrelatedness exists.

### ii.    Centralized Control of Labor Relations

"The control required to meet the test of centralized control of labor relations is not potential control, but rather actual and active control of day-to-day labor practices." *Gilliland v. Sanico Clanton, LLC*, 2019 WL 5700733, *4 (M.D. Ala. Nov. 4, 2019) (internal quotation marks omitted). "[This factor] has traditionally been [deemed] most important, with courts refining their analysis to the single question, '[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?'" *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 764 (5th Cir. 1997). The court may also consider several "indicia of control" in analyzing the parent corporation's control of labor relations, including "the authority to hire,

transfer, promote, discipline or discharge; the authority to establish work schedules or direct work assignments, and the obligation to pay or the duty to train the charging party." *Lyes*, 166 F.3d at 1345 (alteration adopted and internal quotation marks omitted) (quoting *Oaks v. City of Fairhope, Ala.*, 515 F. Supp. 1004, 1035 (S.D. Ala. 1981)).

Here, it is evident that Strogov had the authority to hire, transfer, promote, discipline, discharge, establish work schedules and/or direct work assignments, pay salaries, and train employees at both SP and FP. However, the Rule 56 record makes clear that, as it relates to the day-to-day management, Squires and Richardson managed SP, and Strogov, Pinholster and Cushen managed FP. And, to be sure, there is no evidence in the Rule 56 record suggesting that the operations of FP affected, in any manner, the operations of SP. Nonetheless, Strogov is the common denominator between SP and FP, and there is at least a question of fact as to whether he possessed "actual and active control of day-to-day labor practices" of both SP and FP. *Gilliland*, 2019 WL 5700733, at *4.

Additionally, with respect to employees of FP assisting in the operations of SP, Pinholster's involvement with SP raises questions as to the level of control she (as an employee of FP) may have exercised over SP. She worked exclusively for FP in 2017 and has never worked as an employee of SP; nevertheless, she managed many of the human resources aspects of SP during its start-up phase. For instance, she initially sent Plaintiff her employment offer on behalf of SP. She was also involved in the SP management meeting where Strogov and Squires determined who would fill the physician position at SP. And, she was present during Strogov's phone call with Plaintiff when he informed her they were "going with" Griffin as the candidate.[36] Finally, Pinholster had some level of involvement in creating the clinics' employment agreements, and the

---

[36] The court notes that Squires -- a 50 percent owner of SP -- was not present for this phone call.

record is unclear as to whether each clinic had its own, separate employment agreement or if there were common agreements.

"The focal point of the court's inquiry is 'the degree of control an entity has over the adverse employment decision on which the Title VII suit is based.'" *Walker v. Boys and Girls Club of Am.*, 38 F. Supp. 2d 1326, 1330 (M.D. Ala. 1999) (quoting *Llampallas*, 163 F.3d at 1244). Here, Plaintiff has presented substantial evidence about the involvement of FP employees in SP, and in the decision to not hire her. This raises a genuine issue of material fact as to whether SP and FP have centralized control of labor relations.

### iii.    Common Management

"Cases treating two separate corporate entities as a single employer have placed heavy emphasis on the existence of common directors and officers." *Fike v. Gold Kist, Inc.*, 514 F. Supp. 722, 727 (N.D. Ala. 1981), *aff'd*, 664 F.2d 295 (11th Cir. 1981) (citing *Baker v. Stuart Broadcasting Co.*, 505 F.2d 181 (8th Cir. 1974)).

Strogov owns 100 percent of FP. He has managed FP with Pinholster and Cushen. (Doc. # 27-1 at 17). They were collectively responsible for the day-to-day management decisions, while Strogov alone was responsible for the big picture decisions. (*Id.* at 19). Rose was not involved in management decisions at FP in 2017. (*Id.*). Squires does not have (and has not had) involvement with any managerial decision-making at FP. Strogov and Squires each hold a 50 percent ownership interest in SP. Squires and Jennifer Richardson (the office manager) are responsible for the day-to-day management of SP, while Strogov and Squires are responsible for big picture decisions. (*Id.* at 27).

Again, Strogov is a common denominator between SP and FP, and, though not dispositive, this raises material issues of fact about common management.

#### iv.     Common Ownership or Financial Control

Under this final factor, courts ask who owns the companies. *See Cruz-Lovo v. Ryder Sys., Inc.*, 298 F. Supp. 2d 1248, 1254 (S.D. Fla. 2003). It is undisputed that Strogov held at least 50 percent ownership of SP and FP during the relevant time period—2017. There is also evidence of inter-company loans made by FP to SP during SP's start-up phase. Thus, there is evidence of common ownership and financial control. This factor weighs in favor of a finding of a "single employer," but, again, it is not dispositive. *See Keenan*, 1999 WL 33590522, at *4.

For all of the reasons discussed above and viewing the evidence under the appropriate factors and in the light most favorable to Plaintiff, the court concludes that whether SP and FP are a "single employer" under Title VII is a question of fact that must be resolved by a jury.

#### 3.     Strogov Is Not a Proper Title VII Defendant

The Eleventh Circuit has recognized that "[i]ndividual capacity suits under Title VII are … inappropriate." *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (citations omitted). Indeed, "Title VII does not permit imposition of liability upon an individual *unless* they meet Title VII's definition of employer." *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 404 (6th Cir. 1997) (emphasis added) (citing *Grant v. Lone Star Co.*, 21 F.3d 649, 653 (5th Cir. 1994)); *see Anderson v. Surgery Center of Cullman, Inc.*, 2017 WL 1210122, *10 (N.D. Ala. Jan. 13, 2017).

Here, Plaintiff has failed to sufficiently establish that Strogov, as an individual, is an employer under Title VII. And, although Plaintiff argues otherwise, parent-subsidiary authority is wholly inapplicable here, as each clinic is a "separately incorporated company[y]." *Keenan*, 1999 WL 33590522, at *5. Therefore, Strogov is not a proper defendant in this action and is due to be dismissed. This is not a close call.

**B.    Plaintiff Has Established a *Prima Facie* Case of Sex Discrimination**

Title VII forbids an employer from discriminating against an employee on the basis of sex. 42 U.S.C. § 2000(e)-2(a). "The Pregnancy Discrimination Act amended Title VII to provide that discrimination on the basis of sex includes discrimination 'on the basis of pregnancy, childbirth or related medical conditions.'" *Holland v. Gee*, 677 F.3d 1047, 1054-55 (11th Cir. 2012) (citing 42 U.S.C. § 2000e(k)). "The analysis for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits." *Id.* at 1055 (quoting *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000)) (internal quotation marks omitted).

In the absence of direct evidence showing that an employer discriminated against an employee on the basis of a protected characteristic (here, sex), a plaintiff generally seeks to establish a *prima facie* case, which "create[s] an inference of discrimination." *Mills v. Cellco P'ship*, 376 F. Supp. 3d 1228, 1237 (N.D. Ala. 2019) (quotation omitted).

Here, the parties' briefing focuses on whether Plaintiff has established a *prima facie* case under the *McDonnell Douglas*[37] framework. In a failure-to-hire case, a plaintiff may establish a *prima facie* case by demonstrating that: "(1) she was a member of a protected class; (2) she applied and was qualified for a position for which the employer was accepting applications; (3) despite her qualifications, she was not hired; and (4) the position remained open or was filled by another person outside of her protected class." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002). "If a plaintiff makes this showing, then the employer must have an opportunity 'to articulate some legitimate, non-discriminatory reason for' treating employees outside the protected class better than employees within the protected class." *Young*, 575 U.S. at 213 (citation omitted). "If the employer articulates such a reason, the plaintiff then has 'an opportunity to prove

---

[37] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

by a preponderance of the evidence that the legitimate reasons offered by the defendant [*i.e.*, the employer] were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Here, it is undisputed that Plaintiff was qualified for the physician position at SP, that she did not receive the job, and that Griffin, a male outside of the protected class, was hired instead of her. Therefore, Defendants challenge only the first prong of the *McDonnell Douglas* test; that is, whether Plaintiff was in a protected class (*i.e.*, whether she can establish that Defendants knew of her pregnancy at the time the employment decision to hire Griffin instead of Plaintiff was made). *See Brown v. Sara Lee Corp.*, 2009 WL 995755, * 7 (S.D. Ind. April 14, 2009) ("[The] first prong of a *prima facie* case of pregnancy discrimination is that plaintiff was pregnant and the employer knew of the pregnancy." (citing *Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 844 (7th Cir. 2007))). After careful review of the Rule 56 record, the court concludes that Plaintiff has presented substantial evidence, which raises a genuine issue of fact as to whether Defendant knew she was pregnant when it decided to hire Griffin instead of her.

It is undisputed that Defendants were unaware of Plaintiff's pregnancy until Plaintiff called Strogov at 6:01 p.m. on December 19, 2017. Defendants assert that the decision not to hire Plaintiff, and rather to hire Griffin, was made on December 19th at 5:36 p.m.—about 25 minutes before Plaintiff called Strogov. Therefore, they claim they were unaware of Plaintiff's pregnancy at the time they made the decision not to hire her. However, Plaintiff contends that substantial evidence exists that would permit a jury to infer that Defendants had not yet made the decision to hire Griffin (instead of Plaintiff) until December 20, 2017 (the date Defendants received the signed contract from Griffin). Based on the Rule 56 evidence, the court agrees and concludes that there is a genuine dispute of fact on this question.

### C.     Defendants Have Proffered Legitimate, Nondiscriminatory Reasons for Their Decision

Because Plaintiff has established a *prima facie* case of sex/pregnancy discrimination, Defendants are called upon "'to articulate some legitimate, non-discriminatory reason for' treating employees outside the protected class better than employees within the protected class." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015) (citation omitted). "[While] the defendant must clearly set forth . . . the reasons for the plaintiff's rejection," "the employer need not persuade the [finder of fact] that it was actually motivated by the proffered reasons." *Holland*, 677 F.3d at 1055 (quoting *Burdine*, 450 U.S. at 255). This burden is exceedingly light.

Here, without question, Defendants have articulated legitimate, nondiscriminatory reasons for hiring Griffin instead of Plaintiff: (1) the fact that Griffin proposed fewer changes to the contract than Plaintiff; (2) that Griffin did not emphasize, as Plaintiff did, the desire for a partnership track (though this is somewhat disputed); (3) that Plaintiff was "too aggressive" in her negotiations; and (4) that Griffin indicated he wanted to remain in Birmingham, which was the main concern, initially, in offering him a contract (this is also in dispute).

### D.     Plaintiff Has Presented Sufficient Evidence that Requires a Jury to Resolve the Question of Pretext

The burden shifts back to Plaintiff to "prove [that Defendants'] stated reason[s] [are] a pretext for unlawful discrimination." *Hite v. Hill Dermaceuticals, Inc.*, 619 F. App'x 908, 912 (11th Cir. 2015). Where "the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). Importantly, "it is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not . . . motivated" by a discriminatory animus.

*Id.* (quoting *Alexander v. Fulton Cty., Ga.*, 207 F.3d 1303, 1341 (11th Cir, 2000)). Thus, "[t]o prove pretext and avoid summary judgment, the plaintiff must show the employer's proffered reason is false, and discrimination was the real reason for the adverse action." *Hite*, 619 F. App'x at 912 (citing *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006)).

Here, the court concludes that Plaintiff has presented evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendants' proffered legitimate reasons that would allow a reasonable factfinder to deduce that those reasons are unworthy of credence. *Paschal v. United Parcel Serv.*, 573 F. App'x 823, 825 (11th Cir. 2014) (quotation omitted).

Defendants assert that they hired Griffin instead of Plaintiff because, unlike Plaintiff, he engaged in very little negotiations with respect to the terms of the contract, and because he indicated he planned to stay in Birmingham long-term. (Doc. # 27-1 at 135). Additionally, Squires testified that she preferred Griffin over Plaintiff due to (1) his reassurance that he wanted to stay in the area long term; (2) his willingness to take the contract with very little changes; (3) his personality (he seemed "extremely easy" to work with); (4) his positive reviews from previous employment positions; and (5) the fact that his Board exam scores were very good. (Doc. # 27-7 at 62). Squires also testified that SP's attorney, Lerin Ragan, advised SP to offer the position to Griffin over Plaintiff. (*Id.* at 95). However, Plaintiff has presented evidence that generally undercuts each of these reasons. For example, she has pointed to evidence in the Rule 56 record that, from the time that Strogov first met Plaintiff on September 8, 2017, and up until he offered Griffin the contract on December 14, 2017, he made it very clear that Plaintiff was his top candidate.

On September 8, 2017, after Strogov had communicated with Plaintiff about the upcoming

Athens clinic, he told Mullinax that he wanted to "land this candidate" (referring to Plaintiff). (Doc. # 29-20 at 2). In fact, he was willing to present her with an offer of $220,000/year with a $20,000 signing bonus. (*Id.*). Then, on October 19, 2017, although Plaintiff did not apply for the Athens position, Strogov told her that he "would love it if [she] was one of the candidates [he] could choose from" for the Athens position because her "experience, personality, and demeanor are all great." (Doc. # 27-6 at 88). On October 25, 2017, Squires emailed Plaintiff to thank her for visiting SP and to tell her that they "think [she is] a great candidate for [SP]." (Doc. # 27-6 at 91). Plaintiff responded by stating that she "really feel[s] like [their] vision aligns well with [hers] and [she] see[s] this as a great long term career opportunity." (*Id.*). On November 17, 2017, Plaintiff received the employment offer from SP. (Doc. # 27-6 at 108-09). Strogov testified that they wanted to hire Plaintiff due to "geography and [their] expectation that she would provide some longevity and not leave." (Doc. # 27-1 at 51).

While Plaintiff's contract was being reviewed, on December 7, 2017, she emailed Strogov to update him as to the status of the contract, and Strogov responded by telling Plaintiff that he "had high hopes that [she] would be joining the team at [SP]." (Doc. # 27-1 at 53). And, on December 14, 2017, when Strogov emailed Plaintiff with comments on Plaintiff's suggested changes to the employee contract, he reiterated to Plaintiff that she was their "first choice." (Doc. # 29-16 at 1). Strogov also sent Mullinax a text message that same day stating that he had offered the other candidate (presumably Dr. Griffin) a contract to work at SP, but he still wanted Plaintiff to work there. (Doc. # 27-6 at 167). Finally, during the phone call on December 19th, when Plaintiff informed Strogov that she was pregnant, Strogov conversed with Plaintiff in such a way that a reasonable juror could infer that he still, at that time, was considering employing her at SP. (Def. Ex. N, Audio Recording on December 19, 2017, at 3:22-3:25). If, as Defendants contend,

they had already decided to hire Griffin, a jury could find there would be no reason to use that language. And, the fact that Strogov did not inform Plaintiff of their decision to hire Griffin over her until December 20th leaves unanswered questions that are not to be decided by the court but instead by a jury.

Defendants argue that SP extended Griffin an employment offer (along with the employment contract) on December 14, 2017, before they learned Plaintiff was pregnant. (Doc. # 27-2 at 23-24). They also point out that nearly one-half hour before talking with Plaintiff on December 19th (and, in that conversation, learning she was pregnant), Strogov agreed to Griffin's proposed changes and welcomed him "to the team." (*Id.* at 27). In a vacuum, these facts may make it appear undisputed that Griffin was "hired" before Defendants knew Plaintiff was pregnant. But, these facts do not exist in a vacuum.

The Rule 56 record also permits an inference that Strogov was playing both ends against the middle—at least well into the day on December 20th. Or worse. Griffin's contract was not "finalized" until December 27, 2017, and Pinholster did not even send it to him until December 20th, the day after Strogov learned Plaintiff was pregnant. (*Id.* at 26, 32, 35). And, although Dr. Griffin was offered the job and welcomed to the team, Plaintiff had been offered (and accepted) the job and provided a contract before that.[38] Indeed, Plaintiff had also been welcomed to the team, and on December 15th, Squires told Plaintiff, "[w]e are excited you have accepted our offer." (Doc. # 27-6 at 167). The day before that, on December 14th, Strogov texted Mullinax saying that while he had offered Dr. Griffin a contract, he still wanted Plaintiff. (*Id.*). Furthermore, early on, when he had first inquired about the job, Dr. Griffin was initially told the SP position was filled. (Doc. # 27-2 at 19-20). A reasonable juror could conclude that when Strogov finally landed on Dr.

---

[38] The record shows that Plaintiff had (the previous day) accepted Defendants' "final" offer. (Doc. # 27-6 at 167).

Griffin, the position had already been filled by Plaintiff, but that Strogov changed his mind when he learned Plaintiff was pregnant.

Was Strogov (at a minimum) being disingenuous (or even duplicitous) with Plaintiff and Dr. Griffin? Did he in fact make a "final" decision about who to hire one-half hour before learning Plaintiff was pregnant? Or, did he reverse engineer his decision -- and "go with" Griffin -- after learning Plaintiff was pregnant? The court cannot answer these questions. A jury must.

The factual issues in the Rule 56 record demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendants' articulated reasons for hiring Griffin and their contention that they made the decision to hire Griffin before becoming aware of Plaintiff's pregnancy. *Paschal*, 573 F. App'x at 825. Therefore, Plaintiff has presented sufficient evidence from which a reasonable jury could conclude that Defendants' articulated reasons are unworthy of credence and that her pregnancy was the real reason she was not hired. Therefore, Defendants' Motion for Summary Judgment is due to be denied.

## IV.    Conclusion

For all the reasons discussed above, Defendants' Motion for Summary Judgment is due to be denied. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this April 23, 2020.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE